IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 9, 2015 Session

**STATE OF TENNESSEE v. CHARLES ALLEN MCKINNEY**

**Appeal from the Circuit Court for Lincoln County**
**No. S1200100     J. B. Cox, Judge**

_____

**No. M2014-02125-CCA-R3-CD – Filed January 11, 2016**

_____

A Lincoln County jury convicted the Defendant, Charles Allen McKinney, of second-degree murder, child abuse, and child neglect. The trial court merged the convictions for child abuse and child neglect and then sentenced the Defendant to serve twenty-four years for the second-degree murder conviction and a concurrent sentence of two years for the merged child abuse and child neglect conviction, for a total effective sentence of twenty-four years. On appeal, the Defendant asserts that the trial court erred when it admitted evidence of a prior finding of "severe child abuse" and that there is insufficient evidence to support the child abuse and neglect convictions. After a thorough review of the record and applicable law, we affirm the trial court's judgments in part, reverse in part, and remand for further proceedings.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

John S. Colley III, Columbia, Tennessee, for the appellant, Charles Allen McKinney.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Robert J. Carter, District Attorney General; and Ann L. Filer and Holly Eubanks, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the shooting death of Courtney McKinney in the presence of her sixteen-month-old child. A Lincoln County grand jury indicted the Defendant for the second degree murder of his wife, Courtney McKinney, and for child abuse or neglect of their child ("the victim"). At trial, the parties presented the following evidence: Mary Pauline Price, Courtney McKinney's mother, testified that she lived in Summertown, Tennessee, and had two daughters: Ms. McKinney[1] and Ashley Hennessee, who was married to Zachary Hennessee. She recalled that Ms. McKinney and the Defendant married in 2008 and that Ms. McKinney became pregnant with the victim in 2010. Ms. McKinney was twenty-two at the time of her death on May 7, 2012.

Ms. Price testified that she and Ms. McKinney were "really close" and that the two were in daily contact with one another. Ms. Price described Ms. McKinney and the Defendant's relationship as rather tumultuous, with Ms. McKinney leaving the Defendant on several occasions. The two, however, reconciled each time because, according to Ms. Price, Ms. McKinney wanted an intact family.

Ms. Price testified that her daughter was the primary income earner in her home and that Ms. Price cared for the victim while Ms. McKinney was at work. Because Ms. Price spent so much time with the victim, the victim grew attached to Ms. Price and would call her "mama." On one occasion, when the victim exhibited her attachment to Ms. Price, Ms. McKinney told Ms. Price that she wanted to quit her job in order to spend more time with the victim. Ms. Price said that the Defendant was largely unemployed and what employment he did obtain was short-lived. Ms. McKinney's desire to be at home with the victim created tension between the couple, and ultimately Ms. McKinney told the Defendant that she was going to leave him if he did not find and maintain employment.

Ms. Price testified that Ms. McKinney, the Defendant, and the victim lived with her in 2012. During this time the wallet of Ms. Price's friend, "Gilbert," was stolen, and the wallet contained $600. As a result of this incident, Ms. McKinney "kicked" the Defendant out of the residence, but, once again, the two reconciled. Around this time period, the Defendant obtained a job with Goodman Manufacturing in Fayetteville, and the couple moved to an apartment in Fayetteville. It was in this apartment that Ms. McKinney was shot and killed.

Ms. Price recalled the day before Ms. McKinney's death, May 6, 2012. She said that she spoke with her daughter before going to bed. She described the telephone call as

---

[1] There are two victims in this case: Ms. McKinney and the minor child. Because the subject of the appeal focuses on the offenses against the minor child, for clarity we refer to only the minor child as the victim.

"normal" and their conversation as "ordinary." The following morning, May 7, 2012, Ms. McKinney called Ms. Price at around 9:00 a.m. After the two talked for "a bit," Ms. McKinney indicated that she was going to take a shower and would call Ms. Price later. Approximately an hour later, Ms. McKinney called and asked Ms. Price if her brother-in-law, Zachary Hennessee, had a trailer. Ms. McKinney explained that she wanted to move back home but did not have "gas money." Ms. Price told Ms. McKinney that she would contact Ashley Hennessee, Ms. McKinney's sister, to drive her to Fayetteville to give Ms. McKinney gas money, and then Ms. McKinney could follow them home. Ms. Price said that during this conversation Ms. McKinney sounded "normal" but a little "lonely" or "depressed." Ms. Price said that as she spoke with Ms. McKinney she heard a man's voice in the background but when she asked if the Defendant was present, Ms. McKinney said no. At this point, Ms. Price believed the Defendant was at work. As Ms. Price continued to hear a man's voice in the background, she asked again if the Defendant was present and this time Ms. McKinney said, "yes, Mom, he is."

Ms. Price testified that, after speaking briefly with Ms. Hennessee to arrange the drive to Fayetteville, she called Ms. McKinney, and no one answered the phone. Ms. Price grew concerned and sent a text stating, "Courtney, I'm worried about you. Please call." Ms. Price never received a response to this text message. It was approximately 10:30 a.m. at this point, and she and Ms. Hennessee were driving to Fayetteville when Ms. Price received a phone call alerting her that Ms. McKinney had "shot herself." Ms. Price then called the Defendant's mother, Karen Cotham, who was hysterical. Ms. Price said that Ms. Cotham was difficult to understand, but she repeatedly asked Ms. Price if she knew how to get to Ms. McKinney and the Defendant's apartment in Fayetteville. After relaying these telephone conversations to Ms. Hennessee, Ms Hennessee called the police department and the hospital. Ms. Price recalled that, once Ms. Hennessee made contact with the police department, she was instructed to drive to the police station and "not to go to the apartment." Ms. Price stated that during the drive to Fayetteville she "was praying to God to please let [Ms. McKinney] be okay."

Ms. Price testified that she met with Detective Eubanks at the police station and learned that Ms. McKinney was dead. Ms. Price then contacted an attorney to begin the process of obtaining emergency custody of the victim. She confirmed that she did obtain custody of the victim and that in June 2012 a juvenile court judge "found" the victim was a victim of severe child abuse. The Defendant's attorney objected to this testimony about the juvenile court proceeding as unrelated to the issues at trial. The trial court overruled the objection, and Ms. Price confirmed that based upon the juvenile court judge's determination that the victim had suffered severe child abuse, she had custody of the victim.

3

On cross-examination, Ms. Price agreed that Ms. McKinney had dated another man during one of her separations from the Defendant. Ms. Price stated that the couple had been living in Fayetteville for about a week before Ms. McKinney was killed and that Ms. McKinney made the "ultimatum" regarding the Defendant seeking employment "a couple weeks" before she was killed.

James Parkerson, a Fayetteville Police Department officer, responded to a call about a possible suicide at the Taylor Way Apartments located across the street from the Goodman plant. When he arrived, he saw a man standing beside a blue Chevy "flagging" him to a location. Officer Parkerson pulled up next to the man and got out of his vehicle. From there, he could see a man holding a gun to his head while standing between apartment building D and building E. Officer Parkerson identified the Defendant in court as the man he had seen standing between the apartment buildings with a gun to his head. Officer Parkerson approached the Defendant and talked to him until the Defendant placed his gun on the ground. The Defendant told Officer Parkerson that his wife had shot herself four times. Initially, the Defendant did not want to provide his wife's name but ultimately told Officer Parkerson her name. Officer Parkerson was the first officer on the scene, but once Deputy James Owens arrived Officer Parkerson "check[ed] the scene." Eventually his inspection led him to the upstairs portion of Building E where he observed "some burnt things there in front of the doorway." As Officer Parkerson looked through the open door, he saw a female, later identified as Ms. McKinney, sitting on a sofa slumped over. Officer Parkerson did not enter the apartment, but he could observe wounds on Ms. McKinney from the doorway where he stood. He stated that he did not detect any breathing or movement by Ms. McKinney.

Officer Parkerson testified that emergency medical personnel arrived as he was looking in the doorway, and they entered the apartment to check on Ms. McKinney. Officer Parkerson then went downstairs to check on the victim who was with a neighbor.

On cross-examination, Officer Parkerson testified that, at the time he approached the Defendant, the Defendant was "somewhat upset." Officer Parkerson did not recall the Defendant crying or screaming during their interaction. He stated that his conversation with the Defendant was mostly centered on his convincing the Defendant to put the gun down, and then Officer Parkerson moved on to the apartment and checking on the victim. Officer Parkerson agreed that there appeared to be "fire extinguisher dust" covering the burnt items he observed in front of the Defendant's apartment door. The items included a vacuum cleaner, baby stroller, clothes in a laundry basket, and blankets, among other items. About the victim, Officer Parkerson said that she was crying, but "not injured." When asked, Officer Parkerson stated that he did not know why the victim was crying. He said that the victim did not appear to be injured and, therefore, EMS was

4

not asked to "check out" the victim. He recalled that the neighbor asked when she could gather items to care for the victim.

James Owen, a Lincoln County Sheriff's Department deputy, testified that he arrived at the Taylor Way Apartments on May 7, 2012, to assist with a call about a possible suicide attempt. Sergeant Owen recalled that, when he arrived, Officer Parkerson was standing with the Defendant between Apartment D and Apartment E. There was also a short, medium build female in her 40s standing in the area, who was later determined to be the apartment manager. Sergeant Owen approached and observed a gun on the ground. The Defendant stated "something about his wife and somebody had shot his wife or whatever," so Officer Parkerson went to check on Ms. McKinney while Sergeant Owen remained with the Defendant.

About the Defendant's statements to the officers when Sergeant Owen first approached, Sergeant Owen said that the Defendant asked the officers to shoot him, saying "Jesus, I got the devil in my head." The Defendant stated that he had taken the victim to one of the neighbors and that "there'd been somebody in the apartment, might have killed his wife." About the Defendant's demeanor, Sergeant Owen described the Defendant as nervous and "shook up." He stated, "At one time [the Defendant] attempted to cry. It looked like he attempted to cry, but there were no tears coming out."

The Defendant reached to the ground several times but Sergeant Owen had already retrieved the gun. Sergeant Owen said the gun was a 9 millimeter semi-automatic handgun.

Sergeant Owen testified that, at some point, officers moved the Defendant to a patrol car to give him "a place to sit." The Defendant was sitting on the edge of the floorboard in the back seat of the patrol car when EMS was preparing to bring Ms. McKinney down for transport. The Defendant stated that he did not want to see Ms. McKinney. He took out his billfold and looked at a picture Sergeant Owen assumed was of Ms. McKinney and said, "I'm sorry. I love you. I'll miss you. I'll take care of our daughter." He repeated this again at another time. Sergeant Owen stated that he overheard the Defendant telling other officers that a "black man" had been present in their apartment and shot Ms. McKinney. The Defendant said that he "grabbed up the child and got [ ] out of the house." The Defendant also said "something about a fire."

Mark Browning, a City of Fayetteville police officer, testified that when he arrived at the scene Sergeant Owen was standing in a grassy area between two buildings and the Defendant was kneeling on the ground. He described the Defendant as "visibly upset." At Sergeant Owen's request, Officer Browning secured in his patrol car a gun that had been collected at the scene. After a period of time, Officer Browning escorted the

Defendant to his patrol car and sat the Defendant on the ground next to the car. He described the Defendant as upset and talkative at this point. He said the Defendant "bounc[ed]" around to various topics as he spoke, but the Defendant told Officer Browning that he worked at Goodman across the street and his wife had called him to come home that day from work because she was upset. He said he "couldn't go on because his wife had just killed herself." He stated that the couple had recently moved to the apartment complex and had previously lived with family. At one point the Defendant said there was "a black male that might have been up in the apartments" and that the officers should be looking for this man. The Defendant asked Officer Browning about his service weapon and appeared very knowledgeable about firearms. The Defendant reiterated to Officer Browning that his wife had killed herself and then said that her suicide was why he was going to kill himself.

Rhonda Moore testified that she was a manager for Huff Management Company that owned Taylor Way Apartments. Although she had since assumed a position at another complex, Ms. Moore confirmed that she managed the Taylor Way Apartments in May 2012. On May 7, 2012, Ms. Moore stepped outside of her office to smoke a cigarette. When she did so, she observed the Defendant standing between building D and building E. Ms. Moore explained that she knew the Defendant as a tenant in the complex. Initially, she thought he was talking on a cell phone, but as he grew louder and drew her attention she realized the Defendant was holding a gun to his head. Ms. Moore immediately returned to her office and called the police. Lieutenant Parkerson arrived within a matter of minutes, approached the Defendant, and convinced the Defendant to put his gun on the ground.

Ms. Moore testified that some of the apartment residents began coming outside to see what was going on. Ms. Moore said that, because she did not "really know. . . what was going on," she approached the residents to encourage them to go back inside their apartments. She said she placed herself in between the residents and the Defendant and continued to encourage the residents to return inside. The Defendant looked directly at Ms. Moore and said that he did not know her name but recognized her. He then approached her and "kind of went to his knees." Ms. Moore said that she also went to her knees "to keep him calm." She recalled that the Defendant began mumbling, most of which she could not understand. She did, however, understand him to say, "I'm sorry." He stated that Ms. McKinney had shot herself and asked Ms. Moore to get his gun and shoot him. She told him she would not, and he responded, "then I can't. . . . because I have my little girl I have to take care of."

Ms. Moore testified that she sat with the Defendant until Officer Browning escorted the Defendant to the patrol car. The Defendant stated to her, "please, do not let me see her when they bring her out." Ms. Moore testified that the Defendant was

responsive to questions or statements made to him. She described him as scared or afraid and noted that "it seemed like . . . he was crying . . . but he didn't have a tear in his eye."

Ms. Moore testified that the Defendant and Ms. McKinney had lived in the apartment approximately a week before the shooting occurred. She said that she mostly dealt with the Defendant during the application process and he seemed "upbeat" about the move. She said that Ms. McKinney also seemed happy but, as the time for signing the lease neared, she was "a little reserved." Ms. Moore said that she thought that Ms. McKinney became more reserved because she anticipated missing her family.

Ms. Moore testified that, after law enforcement released the crime scene, she entered the apartment to assess any damage. In the "coat closet" located behind the front door, Ms. Moore observed a 13-gallon trash can filled with baby items that had been burned. She said there was fire extinguisher powder in the closet as well as smoke damage to the closet.

Chad Brown testified that he worked as a critical care paramedic for Lincoln Medical Center EMS and responded to a call to the Taylor Way Apartments on May 7, 2012. Upon arrival, Lieutenant Parkerson directed him to an apartment. As he approached the front door of the apartment he noticed "a lot of debris." Mr. Brown said that right inside the doorway were personal belongings and "[a] lot of fire extinguisher spray kind of around the door." Mr. Brown entered the apartment and walked over to Ms. McKinney who was seated on the couch. Initially, he assessed Ms. McKinney and found she was not breathing and had no pulse. He stated that she was seated on the far side of the couch and there was "quite a bit of blood there." He observed a puncture wound to the right side of Ms. McKinney's head and a larger wound to the left side. There also appeared to be wounds "into her right arm" and "a lot of blood to her right leg." Mr. Brown stated that no attempts were made to resuscitate Ms. McKinney due to the wound to the left side of her head with brain fragment and tissue extruding.

Mr. Brown testified that, as he waited for the police to conclude their investigation of the intact crime scene, he contacted Dr. Jones, a medical examiner. Dr. Jones came to the scene and conducted a brief examination of Ms. McKinney, and then Ms. McKinney's body was transported to Lincoln Medical Center.

Jeffrey Smartt, a Fayetteville Fire Department lieutenant, testified that he responded to the scene and observed Sergeant Owen standing near a man on his knees who was "being distraught." The fire fighters proceeded to an upstairs apartment where there were items outside the doorway that had been set on fire and extinguished. Lieutenant Smartt confirmed that he observed fire extinguisher dust in the breezeway and around the doorway to the apartment. Because the fire was already out, Lieutenant

Smartt proceeded into the apartment. Once inside the apartment, Lieutenant Smartt observed Ms. McKinney slumped over on the couch. He said he next noticed wounds to her leg, thigh, and arm. Because the call had indicated there was an attempted suicide, Lieutenant Smartt surveyed the scene and noticed multiple bullet casings on the floor, which he deemed inconsistent with a suicide. The shell casings were located in front of the coffee table that was located in front of the couch where Ms. McKinney was seated. After determining that a suicide had not occurred and that the apartment could be a crime scene, Lieutenant Smartt and the other fire fighters left the apartment.

Dr. William Jones, the county medical examiner, testified that when he entered the apartment he first noticed the gunshot wound to Ms. McKinney's head. At the time, he thought this wound was likely the cause of death. He quickly determined that Ms. McKinney was deceased. Dr. Jones observed multiple gunshot wounds to Ms. McKinney, primarily on the right side of her body with one on her left hand. Dr. Jones pronounced Ms. McKinney dead at 11:15 a.m., and medical personnel transported her body to the hospital.

Shinar Hurd-Smith, a Department of Children's Services ("DCS") child protective investigator, testified that she investigated an alleged child abuse and/or neglect in Lincoln County in May 2012. Ms. Hurd-Smith was to assist another DCS employee, Tammy Howell. En route, Ms. Howell requested diapers for the victim, so Ms. Hurd-Smith stopped and bought diapers and wipes and then proceeded to Taylor Way Apartments. Ms. Hurd-Smith found Ms. Howell in a downstairs apartment with the seventeen-month old victim. The Defendant had taken the victim to a neighbor, and the neighbor was watching the victim while law enforcement conducted their investigation. The victim had been asleep when Ms. Howell arrived but awoke when Ms. Hurd-Smith arrived. Ms. Hurd-Smith examined the victim to make sure she was "okay" and then changed her diaper. Ms. Hurd-Smith said that she also cleaned the victim's face where it appeared she had been crying. The victim grew upset when the DCS workers attempted to take her from the apartment and since the victim had "calmed down from earlier," it was decided to let the victim remain in the neighbor's apartment for the time being.

Ms. Hurd-Smith testified about the victim's behavior that day following the shooting as follows:

> A couple of times in the apartment, and then a few times after we got her in Ms. Howell's car, and even at the DHS office when we went down and talked to the family, she seemed to, at times, kind of not necessarily gasp for air, but more of when a baby has cried a lot, just (onomatopoeia), kind of that and shook her little hands. And then she would kind of whimper a

8

little bit and then she would calm down. And then it might be a time period and she would do that again.

> . . . .

> [W]hile we were in the apartment, it might have been a 10 to 15 minute period with the two that I saw there. And then once - - between that period and us getting her in the car and getting her kind of cooled off, because it was a warm day and we fed her banana, she did it maybe one more time. And I'm not sure what the time span was between coming from the apartment into Ms. Howell's car.

> And then there was a time span, probably I would say, of an hour when we went to DHS. And she was there with family members kind of in and out and she had done it - - done it again down there.

Ms. Hurd-Smith described the noise the victim made as a gasp or "between a cry or a whimper" and the motion the victim made as a shudder or "nervous-type shake." The victim would make a "series of little inhalations," but ultimately she and Ms. Howell were able to soothe the victim.

Ms. Hurd-Smith testified that, later that day, she and Ms. Howell met with the Defendant. Ms. Howell informed the Defendant that he would be unable to have contact with the victim. She recalled that the Defendant was "very calm," but he asked why he was being prevented from contact with the victim. Ms. Howell showed the Defendant his booking sheet indicating he was to be charged with a homicide, and the Defendant responded, "okay."

On cross-examination, Ms. Hurd-Smith testified that the victim did not appear to have any injuries; however, Ms. Price was advised that, given the circumstances, she should have the victim examined.

Tammy Howell, a DCS child protective investigator, testified that when she arrived at the Taylor Way Apartments on May 7, 2012, Officer Parkerson escorted her to where the victim was located in a neighbor's apartment located below the McKinney apartment. When she entered the apartment she met the tenant, Keisha Taylor, and learned that the Defendant had "handed" the victim to Ms. Taylor. The victim was asleep when Ms. Howell arrived, so Ms. Howell just observed her. The victim was wearing a "somewhat dirty" onesie. Ms. Taylor said that the victim's diaper was dirty but, due to the police investigation, they could not enter the upstairs apartment for diapers. There

9

was "dried matter" around the victim's nose, mouth, and eyes "where she may have been crying."

Ms. Howell testified that she learned the victim's name from the Defendant's parents who lived in the same complex. When Ms. Hurd-Smith arrived, she changed the victim's diaper. As Ms. Hurd-Smith changed the victim's diaper, Ms. Howell was able to observe portions of the victim's body and did not see any marks or injuries. As to the victim's behavior, Ms. Howell stated:

> While I was talking with Ms. Taylor a second time - - I saw [the victim] on two or three, it was a couple of times - - while Ms. Taylor was holding her, she would almost gasp a couple of times, take a couple of quick breaths and act like she was going to cry. And she would put her hands out and shake her hands and her arms. Almost take a (onomatopoeia) gasp of breath. And then she would, after a few seconds, sort of self-soothe and calm down. She actually did that, I believe, two times while I was holding her.

Other than the instances while Ms. Taylor and Ms. Howell were holding the victim, Ms. Howell did not recall the victim exhibiting this behavior again.

Ms. Howell testified that she arranged for both the Defendant's family and Ms. McKinney's family to meet at the Department of Human Services office to make a plan for the victim since neither parent was available. Once Ms. McKinney's family arrived, they advised that an attorney had been contacted regarding custody of the victim. Ms. Howell stated that she also met with the Defendant to let him know the victim was "okay" and where the victim was at the time. She also informed the Defendant that DCS had filed a no-contact order based upon the criminal charge against him.

Ms. Howell testified that she attended the juvenile court hearing on the DCS no-contact order. At the hearing, a determination of "a severe abuse finding" was made against the Defendant. Ms. Howell agreed that there was never an allegation of physical abuse or that the victim was not provided with food or liquids but that the concern was that the victim was present at the site of the murder.

On cross-examination, Ms. Howell agreed that the "sole, single, lone basis for alleging that [the Defendant] neglected or abused [the victim] was that she was in the apartment when he shot her mother." Ms. Howell added that, as a further basis, the Defendant was charged with the murder of the victim's mother. Ms. Howell agreed that in the two months following the shooting, there has been no "finding" that the victim suffered physically, emotionally or developmentally.

10

On redirect examination, Ms. Howell testified that at the court proceeding on the DCS no-contact order there was testimony that either the Defendant was holding the victim or the victim was seated next to Ms. McKinney or around the couch when the Defendant shot Ms. McKinney.

Dion Shockley, a Fayetteville Police Department detective, testified that, when he arrived at the crime scene, he saw officers escorting the Defendant away from the area. He proceeded to the grassy area between Buildings D and E where Sergeant Eubanks briefed Sergeant Shockley on the case. Sergeant Shockley observed an ejected intact shell lying on the ground and a cell phone next to a tree at the corner of Building E. Sergeant Eubanks told Sergeant Shockley that Ms. McKinney had possibly committed suicide, so the two officers went to the upstairs apartment. In the breezeway outside of the Defendant's apartment, there was clothing and debris that had been set on fire and extinguished. It appeared the fire had been put out with the use of a fire extinguisher.

Sergeant Shockley testified that Ms. McKinney was seated on the far end of the couch inside the apartment. Ms. McKinney appeared to be deceased. Sergeant Shockley observed that Ms. McKinney had multiple gunshot wounds down the right side of her body, starting at her head and continuing down to her thigh. Ms. McKinney's right side was facing the door, and Ms. McKinney was "slumped over" to the left. Sergeant Shockley recalled that one of the wounds stood out to him as possibly a defensive wound. He explained that, based upon the position of her arm and the location of the gunshot wound through her wrist, it appeared Ms. McKinney had held up her arm to block the gunshot. Sergeant Shockley stated that the numerous gunshot wounds and defensive wound were, in his experience, not consistent with suicide.

Sergeant Shockley testified that he also observed ten to eleven spent shell casings in the room. Sergeant Shockley recalled that there was a coffee table in front of the couch, and the shell casings were lying on the floor in front of the coffee table. Based upon this evidence, Sergeant Shockley opined that Ms. McKinney did not kill herself, that a shooter was involved, and that the shooter was standing near the doorway at the time the gun was fired. Sergeant Shockley testified that there were multiple bullet holes in the arm of the couch to Mrs. McKinney's left side and two bullet holes in the wall.

Sergeant Shockley identified a photograph of the cell phone that was lying on the ground outside the apartment building near a tree. Sergeant Shockley read the display on the phone screen. It said, "Call from Ashley" and displayed the telephone number "931-797-0775." Sergeant Shockley identified crime scene sketches that he made at the scene.

11

Sergeant Shockley testified that he spoke with the downstairs neighbor, Keisha Taylor. She told Sergeant Shockley that she heard a loud noise, and then the Defendant "appeared" with a gun in his hand and "gave her" the victim. According to Ms. Taylor, the Defendant told her that Ms. McKinney had shot herself.

Joel Massey, a Fayetteville Police Department detective, testified consistently with Sergeant Shockley about his observations of the crime scene. Lieutenant Massey stated that he assisted Sergeant Shockley and Sergeant Eubanks in creating a diagram of the living room, taking measurements and photographing the scene. After Ms. McKinney's body was removed from the room, officers found a bullet fragment in the couch. Based upon Lieutenant Massey's observations, he believed a bullet had gone completely through the arm of the couch that was on Ms. McKinney's left side. Officers located one bullet in the apartment wall and one bullet that had gone through the wall.

On cross-examination, Lieutenant Massey confirmed that, upon his investigation of the scene, based on his experience, he did not believe this was a suicide but rather a potential homicide. Lieutenant Massey agreed that both the Defendant and Ms. McKinney were tested for gunshot residue ("GSR") and that there was no testing for the presence of an accelerant involved with the items that appeared to have been burned.

Amy McMaster Hawes, the Davidson County Chief Medical Examiner, testified as an expert witness in the field of forensic pathology. Dr. Hawes stated that she conducted an autopsy on Ms. McKinney's body pursuant to a request from Dr. Jones, the Lincoln County Medical Examiner. Following her examination, Dr. Hawes concluded that Ms. McKinney's cause of death was multiple gunshot wounds and that the manner of death was homicide. Dr. Hawes stated that Ms. McKinney had a perforating gunshot wound to her head, meaning the bullet entered and exited the head. She confirmed that this wound was fatal. The bullet entered the right side of the head and exited on the left side of the head, just above the ear. The absence of the presence of soot and gunpowder stippling indicated that the shooter was more than a "couple feet away" or that something was between the barrel of the gun and Ms. McKinney. No marginal lacerations were found around the entrance wounds, which also indicated that the gun was likely several feet away.

Dr. Hawes testified about another perforating gunshot wound to Ms. McKinney's left hand. The bullet entered the back of the hand and exited near the base of the middle finger on the palm side of the hand. There was also an absence of soot and gunpowder stippling around this wound indicating that the gun was fired from a distance of several feet away from Ms. McKinney. Dr. Hawes stated that there were two graze gunshot wounds, where the bullet goes across or scrapes the skin, to Ms. McKinney's abdomen. Another graze gunshot wound was on the right upper arm. On Ms. McKinney's right

12

thigh there was a perforating gunshot wound. Ms. McKinney also had a perforating gunshot wounds to the right anterior forearm and the right posterior forearm. Dr. Hawes confirmed that both of these gunshot wounds could have been defensive. The right upper arm and the axilla had both sustained perforating gunshot wounds. A combination of penetrating and perforating gunshot wounds were on Ms. McKinney's torso. The right side of the torso had nine separate and distinct entrance wounds and one exit wound on the left side of the abdomen. Dr. Hawes recovered eight bullets from inside the left side of the torso. The autopsy revealed that Ms. McKinney sustained bleeding to both sides of her chest, multiple fractured ribs, and multiple bullet holes to both lungs, her heart, her left kidney, and her stomach. Dr. Hawes testified that, independently, any of the nine gunshot wounds to Ms. McKinney's torso could have been fatal. Dr. Hawes testified that she ruled the death a homicide based upon the number and locations of the injuries. Further, there was no indication that a gun was found in Ms. McKinney's hand or near her.

Kimberly Lang testified that in 2012 she worked on the assembly line at the Goodman plant in Fayetteville. She worked with the Defendant on the assembly line while he was employed by Goodman. She described the Defendant as a "hard worker." Ms. Lang and the Defendant worked next to each other, and they would often talk as they worked. During one of their conversations, the Defendant disclosed to Ms. Lang that he carried a gun on his person; however, Ms. Lang stated that she had never seen the gun.

Ms. Lang testified about a conversation with the Defendant at work on May 7, 2012, before the shooting. She said the Defendant told Ms. Lang that Ms. McKinney had cheated on him before and how happy he was that he forgave her because now "he had his princess and how much he loved his little girl." The Defendant told Ms. Lang that his family had a "great time" over the weekend. At some point in the morning, the Defendant took an unscheduled bathroom break, and when he returned he was "angry and upset." Ms. Lang explained that, when an employee took an unscheduled break, another employee had to come to the area to continue the assembly work.

Ms. Lang testified that the Defendant made several more unscheduled breaks to the bathroom and appeared to be more angry each time he returned, so Ms. Lang thought the Defendant might have had a stomach virus. She said it was "abnormal" for the Defendant to take so many unscheduled breaks because he was a "hard worker" and "wouldn't leave you hanging." Ultimately, the Defendant stated that he "was tired of all the bulls**t and he was not going to put up with it" and left. Ms. Lang said that she assumed he had quit. When someone from the personnel office came to inquire about the Defendant, Ms. Lang explained, "he got mad and left."

13

Sharon Neal testified that she had worked at the Goodman plant for twenty-six years. At the time of trial Ms. Neal worked as a wire machine operator, but in May 2012, she had worked as a utility operator. This position was a supervisory role where Ms. Neal was to ensure other employees were doing their jobs effectively and efficiently. Ms. Neal oversaw approximately twenty employees at a time, and in May 2012, the Defendant was one of those employees. Ms. Neal explained that she trained the Defendant from his first day at the plant. The Defendant's primary position was unloading the line in the coil department.

Ms. Neal described the Defendant as a "good worker" but said that he "had a little kid to be worked out." She explained that the Defendant would sometimes act "child-like" in that he would get lost "from his work station." She said the Defendant was "inquisitive" and would want to "go see what else was going on," causing Ms. Neal to have to speak with him about staying focused on his assigned task.

Ms. Neal recalled that on the Defendant's first day of work he dropped his coat on the floor below the coat rack. Ms. Neal walked over to pick it up and found the coat was heavy. She asked the Defendant what was in the coat, and he told her it was his gun that he kept for protection. Ms. Neal instructed the Defendant to never bring a gun to work, and she never saw him with a gun after that.

Ms. Neal testified that on the morning of May 7, 2012, the Defendant appeared preoccupied and distant at work. Ms. Neal recalled that she addressed with him his failure to pay attention to his work. The Defendant continued to work and then asked to go to the bathroom because his stomach was bothering him. Ms. Neal responded that it was ten minutes until the scheduled break but the Defendant insisted that he needed to go to the bathroom immediately, so Ms. Neal allowed it. The scheduled break came and passed, and, when the Defendant still had not returned, Ms. Neal notified her supervisor, who informed Ms. Neal that the Defendant had left.

Malcolm Sylvester testified that, in May 2012, he worked at the Goodman plant with the Defendant unloading coils. As the two men worked, they talked about hunting, fishing, and family. The Defendant told Mr. Sylvester that Ms. McKinney had had surgery and that he was concerned about her. One day, when Mr. Sylvester gave the Defendant a ride home, the Defendant stated that he carried a gun on his person at all times. Mr. Sylvester told the Defendant he could be fired for taking a gun to work.

Mr. Sylvester testified that, on May 7, 2012, the Defendant's last day at work, the Defendant approached Mr. Sylvester when he arrived at work and "mentioned about [Mr. Sylvester] taking his job." When Mr. Sylvester asked the Defendant why, the Defendant responded that he was considering "walking out or quitting." Mr. Sylvester urged the

14

Defendant to keep his job because it was difficult to get a job that pays as well. He suggested that the Defendant might consider a "transfer" instead, and the Defendant agreed that he would "probably" continue working at Goodman.

Mr. Sylvester testified that later that morning he relieved the Defendant from his task so the Defendant could take an unscheduled break to the bathroom. The Defendant returned, continued working, and twenty or twenty-five minutes later, the Defendant asked Mr. Sylvester to cover his work again so he could go to the bathroom because he felt sick. Mr. Sylvester agreed to do the Defendant's work so he could go to the bathroom, and, when the Defendant returned, Ms. Jean Baker, a supervisor, gave the Defendant a pass to the nurse's station. Mr. Sylvester did not see the Defendant again after that.

Jean Baker testified that in May 2012 she worked as a supervisor at the Goodman plant. On May 7, 2012, she observed the Defendant using someone else's cell phone to make calls. Ms. Baker confirmed that she was aware that the Defendant was allowed to take an unscheduled bathroom break on this day. When the Defendant returned, he told Ms. Baker that he was sick and needed to leave. He explained that his "cancer medicine" was making him sick. Ms. Baker was unaware of a cancer diagnosis or treatment. Ms. Baker described the Defendant as "adamant to leave." Ms. Baker told the Defendant he might lose his job if he left, and the Defendant responded that he "wasn't worried about that." Ms. Baker said that she wrote a pass for the Defendant to go the medical office.

The parties stipulated to the entry of the time clock records from Goodman Manufacturing. The records showed that the Defendant checked in at work on May 7, 2012 at 3:55 a.m. and checked out at 6:47 a.m. for a total of 2.87 hours.

Mac Kidd testified that he was the senior paramedic and work comp specialist at Goodman Manufacturing. He explained that he managed the medical clinic located in the plant and processed all work comp claims. Mr. Kidd confirmed that the Defendant came into the medical clinic on May 7, 2012, said he was sick and wanted to go home.

Steve Scott, a TBI special agent forensic scientist in the firearms identification unit, testified as an expert witness in the field of firearm identification. Agent Scott analyzed a 9 millimeter handgun (Sig Sauer), a magazine with two cartridges inside, gun flashlight, eleven shell casings, a fired projectile retrieved from the apartment, and eight bullets recovered during the autopsy. Agent Scott confirmed that, based upon testing, seven of the eight bullets found in Ms. McKinney's body were fired from the Defendant's 9 millimeter handgun. The eighth bullet showed similar characteristics, but the similarities were insufficient for a more conclusive examination. The bullet recovered from the wall in the apartment also showed the same class characteristics, but

15

due to the mutilated condition of the bullet Agent Scott was unable to conduct a more conclusive examination. All eleven shell casings from the crime scene were fired from the Defendant's 9 millimeter handgun. The two unfired cartridges found inside the magazine were the same type and design as the shell casings recovered at the crime scene and the bullets loaded in the cartridges were the same type and design as the bullets found in Ms. McKinney's body and the wall of the apartment.

William Johnson, a Lincoln County Sheriff's Department deputy, testified that in May 2012 he worked as a corrections officer in the Lincoln County Jail. On May 7, 2012, Deputy Johnson was supervising inmates as they passed out food trays for dinner in the evening. After the dinner period was over, Deputy Johnson went to the cell where the Defendant was to retrieve the food tray. When Deputy Johnson noticed the food tray was largely untouched, he said to the Defendant, "Oh, so we're not too hungry today?" And the Defendant responded, "[N]o, sir. I'm not too hungry today, I just shot my wife." Deputy Johnson stated that he did not know the Defendant at the time and was unaware of the nature of the Defendant's incarceration.

Deputy Johnson testified that, on a later date, he transported the Defendant from the jail to the prison in Nashville. Deputy Johnson said that the drive was about an hour and a half and generally he did not engage in much conversation with inmates when he transported them. On this particular trip, Deputy Johnson drove a patrol car, and the Defendant sat in the back alone. Deputy Johnson testified about a statement the Defendant made during the trip:

> [The Defendant] said to me that after the last time I had [transported] him, [the Defendant] had seen his attorney and he stated that he was going to be getting second-degree murder charge and he could deal with that, no problem.

On cross-examination, Deputy Johnson testified that he could not recall the date of this conversation. He believed it was during the last transport he made with the Defendant in 2013. Deputy Johnson confirmed that he did not tell his superiors about this conversation but disclosed it to the prosecutors during a "deposition."

Douglas Boeringer, a Lincoln County Sheriff's Department investigator, testified that he was present during the May 7, 2012 interview of the Defendant at the Sheriff's Department. Deputy Boeringer described the Defendant as calm initially but as the interview progressed, at one point, he became upset. Deputy Boeringer testified that he understood that the Defendant had invoked his *Miranda* rights at the time of arrest but then later contacted Detective Eubanks indicating he wanted to give a statement. Thus, this interview was at the Defendant's request.

16

Adam Eubanks, a Fayetteville Police Department officer, testified about his involvement in this investigation. Sergeant Eubanks responded to a request for a detective at the Taylor Way Apartments. When he arrived, Lieutenant Parkerson directed him to an upstairs apartment where EMS and fire personnel were gathered outside the door. Sergeant Eubanks entered the apartment and saw Ms. McKinney seated at the far end of the couch with multiple bullet wounds. As he approached the couch, he saw spent casings on the floor to his right. Lieutenant Parkerson joined Sergeant Eubanks in the apartment and told him that the Defendant had said that Ms. McKinney had shot herself four times. Sergeant Eubanks found the Defendant's statement to be inconsistent with his observations in the apartment because the number of gunshot wounds and the number and location of the spent casings were not consistent with a suicide.

Sergeant Eubanks testified that, based upon Ms. McKinney's position on the couch, the gunshot wounds, the location of the shell casings, and the bullet holes in the wall, a shooter was likely standing in the doorway of the apartment while firing the gun. At Lieutenant Massey's request, Sergeant Eubanks went downstairs and spoke with the Defendant, who was seated on the edge of the back door floorboard of a patrol car. Sergeant Eubanks introduced himself to the Defendant and advised him of his rights. The Defendant agreed to speak with Sergeant Eubanks. The Defendant told Sergeant Eubanks that he had gone out to his car to retrieve something when he heard a knocking sound "from around the apartments," then he "saw a black man," and he began running toward the apartment. Sergeant Eubanks said that he stopped the Defendant at this point and told him to "be honest." The Defendant then indicated he wanted to talk with an attorney, and Sergeant Eubanks ceased all questioning.

Sergeant Eubanks testified that he observed evidence of a fire outside the apartment door that had been completely extinguished. Sergeant Eubanks said that there were items in the breezeway and just inside the front door that had fire extinguisher dust on them. Based upon his observations at the scene, Sergeant Eubanks opined that there had been a "small fire" in the coat closet that was extinguished quickly, and then some of the items were moved outside. Sergeant Eubanks did not see any evidence of an accelerant used in relation to the fire.

Sergeant Eubanks testified that he was present at the autopsy the following day, May 8, 2012. Following the autopsy, he delivered various pieces of evidence to the TBI for analysis and then drove back to Fayetteville. On the drive back to Fayetteville he received a phone call from the Defendant's mother. She said that the Defendant wanted to speak with Sergeant Eubanks. Sergeant Eubanks returned to his office and drafted a special waiver since the Defendant had previously invoked his right to counsel, and then he proceeded to the jail where he met with the Defendant. Sergeant Eubanks read the

waiver to the Defendant, and the Defendant indicated he understood his rights and wanted to speak with Sergeant Eubanks.

Sergeant Eubanks testified that the Defendant stated that he shot Ms. McKinney. The Defendant stated he had come home from work early. The Defendant then made a passing reference to a fire but proceeded to talk about events after the fire. Sergeant Eubanks said the Defendant mentioned the fire "like [it was] a secondary event." The Defendant said Ms. McKinney had a headache and was seated on the couch with her feet up. The Defendant was seated on the floor to Ms. McKinney's right holding the victim in his arms. The victim was crying, and, as he tried to comfort her, Ms. McKinney became "irate." The Defendant put the baby down, and Ms. McKinney reached for his gun that he had placed on the coffee table. The Defendant grabbed the gun from Ms. McKinney and shot her. The Defendant told Sergeant Eubanks that he then picked up the victim and ran downstairs with the gun, while calling his mother and father to tell them Ms. McKinney had killed herself. Once downstairs he saw the downstairs neighbor who had heard the gunshots, and he handed her the victim and asked her to take care of the victim. The neighbor agreed, and then he went to the grassy area between the two apartment buildings where police officers found him.

Sergeant Eubanks testified that the Defendant specifically stated that he was not claiming self-defense but claiming third-party defense on behalf of the victim. The Defendant told Sergeant Eubanks that Ms. McKinney would slap the victim "from time to time" and that she was "verbally abusive." The Defendant admitted lying to the officers at the scene. He explained that he was trying to protect his wife because he did not want her family "to think the last thing she did was try to hurt [the Defendant] or [the victim]." The Defendant admitted that the Sig Sauer gun recovered at the scene was his gun. The Defendant acknowledged that he was aware that Ms. McKinney was homesick and had arranged to move to Ms. Price's that day. The Defendant stated that he tried to give Ms. McKinney money so that she could go to her mother's house. The Defendant also referenced "anger issues" over the couple's separations.

On cross-examination, Sergeant Eubanks testified that he reviewed the text messages and phone calls to and from the cell phone found at the scene on May 7, 2012. He agreed that there was a text message to "John M." asking if he had gotten his gun yet. Sergeant Eubanks said that he did not try to make contact with "John M" because he understood that the Defendant and Ms. McKinney shared the cell phone and there would be no way of knowing who sent the text message. Sergeant Eubanks agreed that there was a picture texted to Alex Smith from the phone on May 6, 2012, of a gun that looked like the murder weapon.

18

Sergeant Eubanks testified that after retrieving the gun he confirmed the serial number to check for a stolen record. He learned that the gun was purchased in September 2011 and that Ms. McKinney had filled out the application for the gun.

After the State concluded their proof, the Defendant presented the following evidence: Alexander Smith testified that he and the Defendant grew up together. Mr. Smith, at the time of trial, lived in Texas, but made trips back to Lawrence County. During one such trip, several months before Ms. McKinney's death, he admitted to the Defendant that he "had feelings" for Ms. McKinney. He described his relationship with the Defendant as "strained" following this conversation, although the two men continued to see one another when Mr. Smith would be in Lawrenceburg. During the same week as his discussion with the Defendant about his feelings for Ms. McKinney, Mr. Smith met Ms. McKinney at a gas station where he gave her $200 to "help her out" and asked her to come to Texas. Several minutes after meeting with Ms. McKinney, Mr. Smith received a phone call from the Defendant telling Mr. Smith to cease contact with Ms. McKinney. Mr. Smith admitted that he and Ms. McKinney had continued to communicate through text messages.

On cross-examination, Mr. Smith testified that he invited Ms. McKinney to come to Texas because she had called him one night at 2:30 a.m. crying. She told Mr. Smith that the Defendant had told her that if she left him, he would kill her. Mr. Smith said that the first time he was contacted by the police was two weeks before the trial.

Shirley Garland, the Defendant's grandmother, testified that the Defendant called her Sunday night saying the victim needed diapers and wipes. Ms. Garland said she agreed to bring over diapers and wipes first thing the following morning. Ms. Garland arrived at the Defendant's apartment between 8:30 and 9:00 a.m. The Defendant was talking with Ms. Garland about the television when Ms. McKinney entered the room. Because Ms. McKinney did not make eye contact or speak with Ms. Garland, Ms. Garland decided to leave.

Ms. Garland testified that the Defendant, Ms. McKinney, and the victim lived with her for the fifteen months before they rented the apartment in Fayetteville. Ms. Garland stated that the Defendant was a very involved father and that Ms. McKinney "slept most of the day" after staying up most of the night.

After hearing this evidence, the jury convicted the Defendant of second degree murder, child abuse and child neglect. The trial court merged the Defendant's convictions for child abuse and child neglect and sentenced the Defendant to serve concurrent sentences of twenty-four years for the second degree murder conviction and

two years for the child abuse and neglect conviction.  It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal the Defendant asserts that the trial court erred when it admitted evidence of a prior finding of "severe child abuse" and that there is insufficient evidence to support the child abuse and neglect conviction.  The State asks this Court to affirm the trial court in all respects.

## A. Evidence of a Prior Finding of Abuse

The Defendant argues that the trial court erred in admitting evidence that the juvenile court had previously ruled he was guilty of "severe child abuse."  The State responds that the trial court correctly found that the evidence was relevant to explain DCS involvement in this case.

At trial, the State asked Ms. Price about meeting with Detective Eubanks and learning of Ms. McKinney's death.  The following exchange then occurred between the prosecutor and Ms. Price:

| | |
|---|---|
| State: | [D]id you immediately contact an attorney and start the process to get emergency custody of your granddaughter? |
| Ms. Price: | Yes. |
| State: | Okay.  Did you obtain custody from Judge Myrick? |
| Ms. Price: | Yes. |
| State: | In June of 2012, after the judge found her to be a victim of severe child abuse - - |
| Defense Counsel: | Judge, objection.  The findings of that court are not relevant or controlling on this jury, although the State wants the jury to think that.  It has - - I think that's a civil proceeding.  It has nothing to do with what we're doing here today |
| Court: | General, you want to speak to that? |

20

State:          I believe it has everything to do with what we're here about today. Judge Myrick found, that based upon the circumstances of [Ms. McKinney's] death, that the child, [the victim], was the victim of severe child abuse and neglect. And gave custody to her maternal grandmother.

It's a different burden of proof, but that doesn't make it irrelevant.

The trial court then issued the following curative instruction to the jury:

As it relates to where we are, the - - his - - his finding relates to only what the custody of the child is now, and should be given that weight and that weight alone.

Otherwise, as it relates to a classification of that finding, this jury's going to be responsible for determining the facts of the case based on what happened on those days.

With that proviso, with that curative instruction, we'll go from there.

Ms. Price then confirmed that based upon "Judge Myrick's determination," Ms. Price had custody of the victim.[2]

In Tennessee, admissibility of evidence is generally within the sound discretion of the trial judge. *State v. Saylor*, 117 S.W.3d 239, 247 (Tenn. 2003). Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.01[4] (4th ed. 2000). Tennessee Rule of

---

[2] The juvenile court finding of "severe abuse" by the Defendant against the victim was also testified to by DCS investigator Tammy Howell. The Defense objected and the trial court said it would take "the same approach" as it did with Ms. Price's testimony; however, no curative instruction was issued.

Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. *See Forbes*, 918 S.W.2d at 449.

In this case, the trial court allowed the jury to hear testimony that a juvenile court judge had determined that the Defendant was guilty of severe child abuse based upon the conduct for which the Defendant was charged with child abuse in this case. The trial court found that this evidence was relevant to show why the child's maternal grandmother had custody of the child at the time of trial. In our view, the custody of the victim at the time of trial was not relevant to any issue in the Defendant's trial. Even assuming that this prior adjudication by the juvenile court was relevant, any probative value is substantially outweighed by the danger of unfair prejudice. The jury was told by a witness that the juvenile court judge had already determined that severe child abuse had been committed by the Defendant as a result of the shooting incident. This was the very issue to be decided by the jury in the Defendant's trial for child abuse and child neglect. We cannot conclude that testimony that a judge had already determined that the Defendant had abused the child did not affect the jury's verdict. Therefore, we must vacate the Defendant's convictions for child abuse and child neglect and remand those cases for a new trial.

## B. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence only as it relates to his convictions for child abuse and child neglect. We have already determined the Defendant is entitled to a new trial on these offenses. In the event of further review, however, we address the Defendant's challenge to the sufficiency of the evidence supporting these convictions. The Defendant asserts that the State presented no evidence of injury to the victim to support his merged convictions for child abuse and child neglect. The State responds that the evidence is "more than sufficient to establish that the Defendant knowingly treated his sixteen-month-old daughter in a manner that adversely affected the child's health and welfare." We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R.

App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at

775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Child abuse and child neglect, in relevant part, is defined as the knowing abuse or neglect of a child age eight years of age or younger, "so as to adversely affect the child's health and welfare." T.C.A. § 39-15-401(b)(2014). Therefore, in order to sustain the child abuse and child neglect conviction in this case, the State was required to prove that the Defendant knowingly abused and neglected his daughter, the victim, who was under the age of eight years, resulting in an adverse effect on the victim's health and welfare. *Id*. The Defendant does not dispute that he acted knowingly or that the victim was under the age of eight years, but he contends that the evidence did not show an injury or an actual, deleterious effect or harm upon the victim's health and welfare as required in *State v. Mateyko*. 53 S.W.3d 666, 670-71 (Tenn. 2001).

Analyzing the child abuse and neglect statute, the Tennessee Supreme Court noted that "the statute itself does not define the phrase 'so as to adversely affect the child's health and welfare,' nor does it specifically address whether this phrase requires proof of some actual detriment or harm before criminal liability may be imposed." *State v. Mateyko*, 53 S.W.3d 666, 669 (Tenn. 2001). The court held "that some proof of an actual, deleterious effect upon the child's health and welfare must exist before a conviction may be sustained under Tennessee Code Annotated section 39-15-401(a)." *Id*. The court noted that "by further including the 'adverse effects' element in the statute, the General Assembly must have intended that the State show something more than a risk of harm to a child's health and welfare before it could subject a defendant to criminal liability under section 39-15-401(a)." *Id*. at 671. The Mateyko children were found in an "indescribably filthy" mobile home overrun with cockroaches. *Id*. at 668. The *Mateyko* Court summarized the conditions and effect on the children:

> Garbage and refuse were scattered throughout the home, and pungent odors of urine, old fried food, and human feces permeated every corner. . . . Despite living in these abhorrent conditions, however, the children appeared by all accounts to be in good health, and they did not exhibit any signs of illness or other affliction, except that one child was suffering from a cold. Their grandmother later testified that when the children first arrived at her house during the early morning hours of May 2, she believed them to be well-fed and "in perfect health."

24

*Id.* The court concluded that "these vile conditions did produce a risk of harm to the children's health, but fortunately for these children, they were removed from that filthy environment before any harm actually occurred." *Id.* at 672. Therefore, *Mateyko* affirmed this Court's determination that the State had failed to prove child abuse through neglect. *See id.* at 677-78 (remanding "for a new trial on the lesser-included offense of attempted child abuse through neglect").

In *State v. Jeffrey Lloyd Winders*, 1989 WL 105710, at *2 (Tenn. Crim. App., at Nashville, Sept.14, 1989), *no Tenn. R. App. P. 11 application filed*, decided prior to *Mateyko*, this Court concluded that the evidence was sufficient to support a conviction of child neglect against a man who abandoned several children at a convenience store for a short time early one morning. Testimony at trial included that of the children's maternal grandmother who found them "'upset, nervous, shookup [sic] as any children would be.'" *Id.* at *1. We further concluded that there was sufficient evidence of an adverse effect upon the emotional health and welfare of the children on the basis that they "were described as 'cold' and obviously suffering emotional distress from having been left in the dark at an unfamiliar place all alone." *Id.* at *2; *see also State v. Patricia Marie Jenson*, No. M2003-02848-CCA-R3-CD, 2005 WL 1475311, at *5 (Tenn. Crim. App., at Nashville, June 21, 2005) (concluding that crack cocaine smoke in residence which made breathing difficult constituted sufficient evidence of adverse effect to the health and welfare of the child), *no Tenn. R. App. P. 11 application filed.*

The evidence, viewed in the light most favorable to the State, proved that the Defendant shot and killed Ms. McKinney while the victim was in close proximity to Ms. McKinney. The Defendant fired a pistol at least eleven times, hitting Ms. McKinney at least nine times. The Defendant then picked up the crying child while still carrying the gun, fled the scene, and handed the child off to a neighbor. The child exhibited signs of emotional distress, as testified to by two DCS workers who subsequently cared for her. Based upon this evidence, we believe that a jury could reasonably infer that the Defendant's conduct adversely affected the child's health and welfare.

About the Defendant's specific argument that the State failed to prove injury or a deleterious effect on the victim, the trial court stated in its denial of the Defendant's motion for new trial:

> [T]he Defendant argues that his convictions for child abuse and neglect cannot stand because the State did not prove injury to the child. While it is true that there was no expert evidence of an injury to the child, evidence of injury to the child is readily apparent in the record. The proof showed that the child was present in the apartment when all of the shooting occurred. There is no proof that there was a silencer on the pistol that was shot eleven

25

(11) or twelve (12) times in a very short period of time. Handgun discharges are loud and to unprotected ears cause a loss of hearing at the very least.

We agree with the trial court. The evidence of the traumatic experience the victim underwent is well documented in the record. The victim was in a confined space and close to the Defendant when he repeatedly fired his gun at the victim's mother, she witnessed the shooting of her mother, and then was permanently removed from the familiarity of both of her parents and her home. At trial, there was testimony that, following the shooting, the sixteen-month-old victim cried, displayed nervous shudders, whimpered, and was "gasping." We conclude that there is sufficient evidence from which a rational jury could find the Defendant guilty beyond a reasonable doubt of child abuse and child neglect. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

In consideration of the error in admitting evidence that a juvenile court had previously ruled that he was guilty of "severe child abuse," we hold that the judgment of conviction for child abuse and child neglect is vacated and the case remanded to the trial court for further proceedings consistent with this opinion. The judgment of conviction for second degree murder is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE